Filed 5/1/13  P. v. Zmrzel CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ROBERT JOSEPH ZMRZEL,<br><br>        Defendant and Appellant. | C066741<br><br>(Super. Ct. No. 6282501) |

Defendant Robert Joseph Zmrzel sexually abused his adopted daughter, S., on numerous occasions over an eight-year period beginning when she was eight years old. Defendant was convicted by jury of one count of continuous sexual abuse of a child (count 1), two counts of oral copulation of a person under 16 years of age (counts 8 & 9), two counts of committing a lewd or lascivious act on a child of 15 years (counts 10 & 11), one count of attempting to commit a lewd or lascivious act on a child of 15 years (count 13 (lesser included)), and one count of simple battery (count 12 (lesser included)). After dismissing counts 8 and 9, as those crimes were alleged to have occurred during the

1

time period covered by count 1, the trial court sentenced defendant to state prison for an aggregate term of seven years, eight months.

On appeal, defendant contends: (1) the trial court prejudicially erred by denying his request for a psychiatric evaluation of S. in order to assess her competency to testify; (2) the trial court prejudicially erred by declining defendant's request to instruct the jury that the defense expert, Charles L. Scott, M.D., was not allowed to conduct a psychiatric evaluation of S.; (3) the trial court violated defendant's rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] (*Miranda*) by (a) allowing testimony that defendant had been given an opportunity to make a statement to police and had done so, and (b) requiring the jury to be informed, during closing argument, of the content of this statement; (4) the trial court prejudicially erred by allowing the jurors to retain, during the remainder of the trial, their copies of the transcript of a pretext phone call between S. and defendant; and (5) the cumulative prejudice arising from the foregoing assertions of error requires reversal.

As we explain, the trial court was not required to order a psychiatric evaluation in order to determine whether S. was competent to testify. Nor was the trial court required to instruct the jury Dr. Scott was not allowed to conduct the requested psychiatric evaluation. Without deciding whether the trial court improperly required that the jury be informed of the content of a statement defendant made during custodial interrogation before he was advised of his *Miranda* rights, we conclude any error was harmless beyond a reasonable doubt. With respect to defendant's complaint that the jurors were allowed to retain their copies of the transcript of the pretext phone call, we also find no prejudice. Finally, defendant's claim of cumulative prejudice fails. Accordingly, we affirm the judgment.

2

FACTS

In December 1999, S. and her three brothers were adopted by defendant and his wife, Laurie. The Zmrzels already had three children of their own. The family lived in a two-story house on a 13-acre farm in Newcastle, a small town between Lincoln and Auburn. At the time of the adoption, S. was nine years old. S. and her biological brothers lived with the Zmrzels during the year prior to the adoption becoming final.

Defendant began sexually abusing S. soon after she moved into the house. At bedtime, after Laurie went from room to room saying goodnight to the children, defendant would do the same. Defendant stayed in S.'s room longer than Laurie. Defendant would sit on the floor next to S., who was on the bottom bunk of a bunk bed. Because S. was having trouble reading, she would read to defendant for awhile and tell him about her day. Defendant would then say goodnight to S. and tell her he loved her. S. would respond: "I love you too, dad." Defendant "got mad" if she did not tell him she loved him.

At some point during these nightly visits, defendant started to rub S.'s back while she read. He then started to reach beneath her underwear and place his hand on her buttocks and vagina. One night, when S. told defendant to stop, he "got really mad" and "started yelling" at her. S. also tried to end the touching by moving to the top bunk, wrapping herself tightly with her blankets, and sleeping as close to the wall as she could. These obstacles did not prevent defendant from molesting her. When S. was 11 years old, she began developing breasts. Defendant's bedtime routine continued as usual, except that he also began touching S.'s breasts.

When S. was about 12 years old, additional bedrooms were built upstairs. S. moved into one of these bedrooms. Around this time period, defendant started to kiss S., placing his tongue in her mouth, and kissed her neck, legs, and feet. He also began penetrating S.'s vagina with his fingers. When S. was about 13 or 14 years old,

3

defendant began getting into bed with her.  On one occasion, S. again told him to stop.  Defendant "got violently mad" and "pushed [her] against the wall," asking:  "[W]hat is wrong with you[?]  Do you think this is something sexual or something[?]"  On another occasion, he told S. that "he was in love with [her]" and "he didn't love [Laurie]."  Defendant continued to kiss and touch her on a nightly basis.

When S. was about 14 or 15 years old, defendant began kissing her vagina.  Defendant brought condoms into S.'s room, and would put on a condom and rub his penis against her vagina, saying that "he didn't ever want to take the chance of getting [her] pregnant."  Defendant also told S. he was saving money to run away with her when she turned 18 and showed her a stack of $100 bills he kept locked in an "army box."  Eventually, defendant bought a safe and S. believed he transferred the money to the safe.

The abuse ended when S. turned 16.  One afternoon, defendant came into her bedroom while Laurie and most of the other children were at jujitsu practice.  Two of the children were home, but not in the house.  As S. explained the encounter with defendant:  "I tried to leave, and he got mad and he grabbed my arm.  And I told him that I was sick of keeping his dirty little secrets and I pulled away from him.  And I ran down the stairs and he ran after me."  S. then picked up a rocking chair that was in the living room, threw the chair at defendant, and ran into the bathroom, blocking the door with a towel drawer.  As defendant yelled that he was going to break the door down, S. found a bottle of Nix head lice treatment under the sink and considered drinking it.  Defendant's voice then went from "screaming and yelling" to "nice," as if he were "trying to calm [her] down."  S. put the bottle of Nix away, waited for defendant to leave the house, and then ran away to a friend's house.

The next day, Laurie picked S. up at her friend's house and drove to her great-grandmother's house so that S. could have another night away from home to calm down.  On the way, S. threatened to "keep running away."  Laurie responded:  "What do we have to do to make sure that doesn't happen?"  S. then told Laurie she "did not want

4

[defendant] coming into [her] room anymore." S. did not reveal what defendant had done to her. Laurie did not ask. Laurie then had a conversation with defendant and told him she did not want him spending time alone with S. in her bedroom. Defendant agreed. S. returned to the Zmrzel house. Defendant stopped coming into her room at night.

A couple days later, defendant brought S. down to the barn and showed her a gun that was in his truck. He told her that when she ran away, "his first response was to kill himself." Defendant and S. then went to his workshop and sat in her brother's truck. Defendant told S. he loved her, and she was "everything he ever wanted." He also told her he would not be coming into her bedroom anymore, but if she changed her mind about wanting to be with him, he would still be saving money for them to run away together when she turned 18. During this conversation, defendant had his arm around S. and put his hand inside her shirt. This was the last time defendant molested his adopted daughter.

About a month before S. turned 18, defendant found out she had a boyfriend. When S. returned home from spending the weekend at her Aunt K.'s house, she discovered one of her goats had died over the weekend. This particular goat had been sick, so the death was not a surprise. The location and condition of the body were. The goat was lying in the pasture with the back legs spread open and the testicles removed. It appeared as though the testicles had been "torn" from the body. S. told Laurie about the goat and said that if a wild animal had killed the goat, it would have taken more than the goat's testicles. Laurie responded: "Maybe someone did that." When S. asked who would have done such a thing, Laurie answered: "Dad was pretty mad when he found out about your boyfriend yesterday." Laurie then laughed and said: "[I]t's probably what he wanted to do to your boyfriend."

S. went back to her Aunt K.'s house. The following weekend, she told her aunt what defendant had done to her. A couple days later, S. reported defendant's crimes to Detective Michael Davis at the Placer County Sheriff's Department. S. also made a

5

pretext phone call to defendant.  During the call, S. told defendant it was only six days until she turned 18 and asked where he stood with respect to running away together.  Defendant responded:  "You want to go with me?  Is that what you're saying?"  He also cautioned:  "There's no turning back if you do it."  When S. said that she did, defendant insisted they wait until she turned 18 and asked:  "What, what happened with you and that other guy?"  S. answered:  "Nothing."  Defendant responded:  "All right.  You know I love you.  You know that."  He then asked:  "And you don't fuckin' dump me in a month or a week or something like that?"  S. asked if defendant would marry her.  Defendant answered:  "Yeah, I would.  Don't, don't, don't be telling anybody this shit either."

S. then said she was "confused" and elaborated:  "It's like, seriously, you are the only person that's ever loved me.  I mean I don't, I don't understand why you would have touched me and tried to have sex with me and all that stuff if, if you didn't.  I, I don't think that you would do that."  Defendant responded:  "I wouldn't.  I would never do that.  I'm telling you the truth."  S. asked:  "Is that why you touched me then and, and wanted to have sex with me really?"  Defendant answered:  "Because I love you.  Because I wanted you, and it was a confused fucking mess that the alternative is a bullet in my head.  That's the alternative."  S. then asked whether he still wanted her "even like after two years now of like not even doing anything."  Defendant answered:  "I don't give a fuck about that if we ever do anything again.  We don't ever have to do anything again.  I'm dead serious.  I don't need to do that.  You don't want to do that, we don't do that ever."

S. then asked defendant why he touched her when she was eight years old.  Defendant answered:  "No, I didn't.  Not, I didn't touch you like that when you were [eight]."  After S. told him she remembered him putting his hands down her pants when she was eight years old, defendant responded:  "Yeah, well that was stupid."  And when she asked him why he touched her like that, defendant answered:  "Because I loved you.

6

I still love you." S. then asked whether defendant loved her more than Laurie, to which he replied: "Look I'll give everything up for you. If that's what you, if you're serious. If you're just testing me, don't, don't do it just to test me because I'll do it." S. responded: "So then it's me, it's not Mom?" Defendant answered: "Yeah, it's you. It's always been you. It's you." S. then asked him to confirm he spent time in her room and touched her because he loved her. Defendant answered: "Yeah" and "That's it. That's it."

Later in the call, S. asked whether the "oral sex" was also defendant's way of expressing his love. Defendant answered: "Yeah, I guess." He then admitted what he did was wrong and said: "When you care about somebody like that, I know I fucked up, okay? It'll be different from now on, though. It'll just be you and I." And when S. said, "I was just a kid, Dad," defendant responded: "I know. I'm sorry about that. Now it's just you and I. Forget about that. I just want you. I don't want anything, anything. Just, just want to be with you. Just want to talk to you; just want to do things with you." Defendant denied touching any of the other children.

Detective Davis arrested defendant later that day. The house was searched. Defendant's safe did not contain any money, but an "army box" in the garage contained two large stacks of $100 bills, totaling $39,000. Laurie was also interviewed by Detective Davis. After listening to the pretext phone call, Laurie confronted defendant with what she had heard during the call. Defendant denied being in love with S. and denied touching her before she was 16 years old, but admitted to three instances of oral copulation that he claimed happened when she was 17 years old.

DISCUSSION

I

*Request for a Psychiatric Evaluation*

Defendant contends the trial court prejudicially erred by denying his request for an order compelling S. to submit to a psychiatric evaluation in order to assess her competency to testify. He is mistaken.

A. *Legal Principles*

"Except as otherwise provided by statute, every person, irrespective of age, is qualified to be a witness and no person is disqualified to testify to any matter." (Evid. Code, § 700.) A person is disqualified to be a witness only if he or she is "[i]ncapable of expressing himself or herself concerning the matter so as to be understood," or is "[i]ncapable of understanding the duty of a witness to tell the truth." (Evid. Code, § 701, subd. (a).) "Capacity to communicate, or to understand the duty of truthful testimony, is a preliminary fact to be determined exclusively by the court, the burden of proof is on the party who objects to the proffered witness, and a trial court's determination will be upheld in the absence of a clear abuse of discretion." (*People v. Anderson* (2001) 25 Cal.4th 543, 573 (*Anderson*).)

"Even if a witness is not entirely disqualified for incapacity to communicate or to understand the duty to testify truthfully, his or her testimony on a *particular matter* (other than expert opinion testimony) is inadmissible 'unless [the witness] has *personal knowledge* of the matter. Against the objection of a party, such personal knowledge must be shown before the witness may testify concerning the matter.' [Citation.] The testimony must be excluded unless 'there is evidence *sufficient to sustain a finding*' that the witness has such personal knowledge." (*Anderson*, *supra*, 25 Cal.4th at p. 573; see also Evid. Code, § 702, subd. (a).)

8

Thus, "a witness must be allowed to testify unless he or she (1) cannot communicate intelligibly, (2) cannot understand the duty of truthful testimony, or (3) lacks personal knowledge of the events to be recounted. But while the first two questions are determined entirely by the court, its role with respect to the issue of personal knowledge is more limited. A witness challenged for lack of personal knowledge *must* nonetheless be allowed to testify *if there is evidence from which a rational trier of fact could find* that the witness accurately perceived and recollected the testimonial events. Once that threshold is passed, it is for the jury to decide whether the witness's perceptions and recollections are credible." (*Anderson*, *supra*, 25 Cal.4th at p. 574; see also *People v. Dennis* (1998) 17 Cal.4th 468, 525-526.)

B. *Additional Background*

Prior to trial, defendant sought an order compelling S. to submit to a psychiatric evaluation for purposes of assessing her competency to testify. The motion was supported by a declaration submitted by Charles L. Scott, M.D., which stated that a review of certain records made available to the defense indicated (1) S. "was a likely recipient of pathogenic (harmful) care during her early childhood," (2) "[s]uch pathogenic care is an important risk factor for the development of Reactive Attachment Disorder," and (3) "a teenager or young adult suffering Reactive Attachment Disorder from early childhood presents concerns in relation to [his or her] ability to accurately relate factual events."

Dr. Scott explained that "Reactive Attachment Disorder is characterized by markedly disturbed and developmentally inappropriate relatedness in teenage and adult years due to pathogenic care beginning before the age of five. Pathogenic care, as described by [the Diagnostic and Statistical Manual of Mental Disorders] may be evidenced by at least one of the following: [¶] (1) Persistent disregard of the child's basic emotional needs for comfort, stimulation, and affection; [¶] (2) Persistent

9

disregard of the child's basic physical needs; or [¶] (3) Repeated changes of primary caregiver that prevent formation of stable attachments (e.g., frequent changes in foster care)."

The records reviewed by Dr. Scott indicated S. was born with methamphetamine in her blood. Her birth mother was incarcerated for four months during the pregnancy and also drank alcohol and used other drugs while pregnant with S. When S. was about three months old, she was placed in protective custody while both of her birth parents were incarcerated. At the age of two years, S. was living with her birth father and his girlfriend. S. was found several blocks from home, wandering the neighborhood with her brother, who was three years old, and the girlfriend's son, who was four years old. The children were dirty and had head lice. The girlfriend's son was carrying a dagger and a lighter. The children were taken into protective custody after the house they were living in was "declared a dangerous building." While at the emergency shelter, S. reported "her dad burned her feet because he was mad at her." She had scars on the top of each of her big toes. S. also reported that "her daddy went to bed with her and that he beats her, and indicated that she had been touched on her vagina and knee with a knife." S. was interviewed by a psychologist at the shelter, who noted S. exhibited "unsocialized feral-like behaviors," including eating off the floor and climbing on furniture, and described her as "starved for affection."

S. and her older brother were briefly placed in a foster home, and then returned to their birth mother. S. later told a different mental health professional "she was forced to consume beer at age [three to four] and was raped at age [five] by her mother's 'druggie friend.' " By this time, S.'s two younger brothers had been born. S.'s birth mother was again arrested for drugs when S. was six years old. The house was dirty. The children had head lice. Shortly thereafter, S. and her brothers were placed in a foster home, where they lived for about two years until moving into the Zmrzel house.

10

Records from Koinonia Foster Homes, from June and August of 1998, also express a concern that S. was " 'demonstrating a pattern which is quite typical of an attachment disordered child,' " including "[d]eviousness and lying," "[t]heft followed by disclaimers of responsibility," "[i]nappropriate sexual talk," "[m]inimization or denial of prior sexual victimization," "[f]abrication of stories not based upon reality," "[l]ack of emotional response when informed [she] would be removed from her mother and offered for adoption," and "[d]ifficulty in relating to surrogate mothers due to a love-hate relationship with her own mother." Laurie also reported in August 1999 that S. "would seek attention inappropriately, at times from strangers," and "would discuss her life freely with people she barely knew." According to Dr. Scott, these reported behaviors are consistent with Reactive Attachment Disorder caused by the pathogenic care S. received early in life. He elaborated: "Persons such as [S.] who suffer from Reactive Attachment Disorder often fail to develop a conscience, do not feel empathy and having genuine affection for other people is beyond their reach. Ability to implement an oath to tell the truth, for example, in court proceedings may be significantly impaired."

In addition to Reactive Attachment Disorder, Dr. Scott expressed concern over a Dissociative Experiences Scale (DES) questionnaire S. completed in July 2009. As Dr. Scott explained, "[t]he DES questionnaire is a screening tool for Dissociative Identity Disorder (DID) that includes 28 questions [asking] the individual about various experiences they may have experienced in their life. In addition, the person is asked to what degree (percentage of time) the experience described in the question applies to him or her. Many of the symptoms reported as part of the DES are symptoms of a variety of psychiatric disorders to include Schizophrenia, Schizoaffective Disorder, Bipolar Disorder, Posttraumatic Stress Disorder (PTSD), Dissociative Identi[t]y Disorder, Substance Abuse Disorder, and/or an underlying medical illness."

According to Dr. Scott, S.'s answers to certain questions "raise serious concerns regarding her ability to accurately observe, recall, and relate factual events. In particular,

11

she acknowledges that over 50% of the time she is not sure if things really happened to her or if she just dreamed them up. Furthermore, her ability to testify requires that [she] recall that she is under oath to tell the truth and be attentive to the questions that are asked of her. Her answer that 40% of the time she finds that she is 'listening to someone talk and does not realize or hear part of all of what is said' raises serious concern regarding her ability to focus on questions asked of her at trial and respond as accurately as possible. Furthermore, [S.] responds that 60% of the time she hears voices inside of her head that tell her what to do or comment on things that they are doing. Although she writes that she believes these 'voices' are 'her own,' she also notes that these voices sometimes conflict with each other. [S.]'s description of experiencing 'voices' is a symptom that is also characteristic of auditory hallucinations noted in individuals suffering from Schizophrenia and other psychotic illnesses. Persons suffering from such psychotic disorders often lose touch with reality and also experience beliefs in things or experiences that are not true (delusions)."

Dr. Scott concluded: "[T]he records substantiate that [S.] met criteria for Reactive Attachment Disorder since early childhood. In addition, more recent records note the presence of marked dissociative symptoms that could significantly impact her ability to accurately observe, recall, and relate factual events. Her symptoms of having amnesia for important events, for having impairment in listening to someone talk, for being unsure if her recall of experiences actually happened or were 'dreamed up,' or for having the experience of hearing 'voices' inside her head could be secondary to a wide variety of psychotic thought disorders or dissociative disorders. A more definitive diagnosis could be further supported by a psychiatric evaluation of the identified victim."

The trial court balanced the right of the defendant to receive a fair trial against the right of the victim to be free from an unjustified intrusion into her privacy and denied the request for a psychiatric evaluation. The trial court explained that Penal Code section 1112 (hereafter § 1112) prohibited it from ordering a psychiatric examination for

12

purposes of assessing S.'s credibility.  Noting it possessed the authority to order such an examination on the issue of competency, the trial court stated that because competency is a matter for the court to decide, even if an examination was ordered, Dr. Scott's findings would not be given to the jury to assist in assessing S.'s credibility.  The trial court explained that the "really intrusive process" of ordering S. to submit to a psychiatric examination was not required to enable it to rule on her competency to testify.  Instead, S. would be allowed to testify, and if the trial court concluded based on her testimony that she was not competent, it would "deal with that as a matter of how the evidence stands." The trial court also noted there was a "voluminous" record of S.'s background and mental health history, which had been released to defendant.

Following the jury's verdict, defendant moved for a new trial.  The motion was based, in part, on the trial court's failure to order S. to submit to a psychiatric examination.  In denying the motion, the trial court stated:  "I found as a trier of fact absolutely no basis to challenge the capacity or competency of the witness to testify. Yes, she was very emotional.  Yes, she was confused as to certain facts, but there is nothing in my admittedly lay opinion that rose to a level of concern by me because of her psychiatric status she either lacked capacity or competency to give testimony."

C. *Analysis*

A trial court has "broad discretion" to refuse a requested psychiatric examination for the purpose of assessing a victim's competency to testify.  (*Anderson*, *supra*, 25 Cal.4th at p. 576; *People v. Ayala* (2000) 23 Cal.4th 225, 264-265.)  The trial court did not abuse its discretion in declining to order such an examination in this case.

Section 1112 prohibits the trial court from ordering "any prosecuting witness, complaining witness, or any other witness, or victim in any sexual assault prosecution to submit to a psychiatric or psychological examination for the purpose of assessing his or

13

her credibility."[1]  However, this provision does not prohibit a trial court from ordering such an examination for the purpose of assessing a complaining witness's competency to testify.  (*Anderson*, *supra*, 25 Cal.4th at pp. 575-576; *People v. Armbruster* (1985) 163 Cal.App.3d 660, 663, fn. 1.)

In *Anderson*, *supra*, 25 Cal.4th 543, our Supreme Court held that a trial court possesses no sua sponte duty to order a psychiatric examination to assess testimonial competency.  (*Id*. at p. 576.)  The court explained that "the grounds upon which a trial court may disqualify a witness as incompetent, or exclude the witness's testimony for lack of personal knowledge, are exceptionally narrow.  The witness must be allowed to testify unless he or she cannot communicate intelligibly or understand the duty to tell the truth, or unless no rational jury could believe the witness actually saw the events he or she claims to have seen.  In many cases, psychiatric testimony, itself 'inherently [subject to] expert debate' [citation], would be less useful on these issues than the court's own evaluation of the witness's demeanor and responses in light of all the evidence. [Citation.]"  (*Ibid*.)

The court further explained that "serious privacy interests, as well as the policy of encouraging witnesses to come forward and testify voluntarily, would be undermined if courts were compelled to order psychiatric evaluations of potential witnesses as a condition of their testimony.  Moreover, *Ballard* itself noted the many 'dangers' of using psychiatric evidence to impeach credibility; 'the psychiatrist's testimony may not be relevant; the techniques used and theories advanced may not be generally accepted; the

---

[1]  This provision was enacted in 1980, and was designed to overrule a line of authority, beginning with *Ballard v. Superior Court* (1966) 64 Cal.2d 159, 171-177 that "indicated a trial court should grant a defense motion for a psychiatric examination of the complaining witness in a sex-crime case where psychiatric evidence appeared necessary to assist the trier of fact in assessing the witness's *credibility*." (*Anderson*, *supra*, 25 Cal.4th at p. 575.)

psychiatrist may not be in any better position to evaluate credibility than the juror; difficulties may arise in communication between the psychiatrist and the jury; too much reliance may be placed upon the testimony of the psychiatrist; partisan psychiatrists may cloud rather than clarify issues; the testimony may be distracting, time-consuming and costly . . . .' [Citations.]  Many, if not all, of these concerns are also pertinent to a court determination of competence.  [Citation.]"  (*Anderson*, *supra*, 25 Cal.4th at p. 576.)

Here, the trial court appropriately took into consideration S.'s privacy interests, balanced these interests against the right of defendant to receive a fair trial, and concluded that an additional psychiatric examination was not necessary in order to assess whether she was competent to testify.  (See, e.g., *People v. Browning* (1980) 108 Cal.App.3d 117, 125 [shooting victim possessed a constitutional right against an unwarranted intrusion into his body for purposes of extracting bullets for forensic examination; this right must be balanced against the defendant's constitutional right to receive a fair trial].)

Defendant complains the trial court appeared to rely on article I, section 28 of the California Constitution (The Victims' Bill of Rights) as the basis for the privacy interests it balanced against defendant's right to a fair trial.  As one of the many listed victim's rights, this constitutional provision states that a victim shall "be treated with fairness and respect for his or her privacy and dignity, and to be free from intimidation, harassment, and abuse, throughout the criminal or juvenile justice process."  (Art. I, § 28, subd. (b)(1).)  In addition, in *Anderson*, *supra*, 25 Cal.4th 543, our Supreme Court used "serious privacy interests" as one justification for declining to impose a sua sponte duty to order a psychiatric examination.  (*Id*. at p. 576; see also *People v. Browning*, *supra*, 108 Cal.App.3d at p. 123 [psychiatric examination involves an invasion into " 'personal dignity and privacy' "].)  We see no reason to conclude that the victim's privacy interests cannot be considered by the trial court in ruling on a request for a psychiatric examination.

15

Defendant also suggests the trial court erroneously believed section 1112 limited its authority to order a psychiatric examination for purposes of assessing competency. Not so. The trial court clearly acknowledged that section 1112 "is focused on the issue of credibility" and neither stated nor implied that this statutory provision prevented it from ordering an examination for purposes of assessing competency.

Moreover, we do not believe a psychiatric examination would have changed the trial court's conclusion that S. was competent to testify. Again, the trial court was required to allow her testimony unless it determined that she could not communicate intelligibly or understand the duty to tell the truth, or unless no rational jury could believe she possessed personal knowledge of the events that transpired between her and defendant. (See *Anderson*, *supra*, 25 Cal.4th at p. 576.) There was no claim that S. lacked the ability to communicate intelligibly. With respect to her ability to understand the duty to tell the truth, Dr. Scott opined that Reactive Attachment Disorder "may" significantly impair her ability to testify truthfully, and the trial court possessed the "voluminous" record relied upon by Dr. Scott in forming this opinion. However, during S.'s testimony, she stated she understood the duty to testify truthfully and would do so. The trial court was entitled to believe her.

Nor do we believe that a psychiatric evaluation would have changed the trial court's implied finding that a rational jury could believe S. possessed personal knowledge of the sexual abuse she suffered at the hands of defendant. Again, the trial court possessed Dr. Scott's declaration and all of the records he relied upon in concluding that S.'s ability to accurately perceive and recall events may be impaired, including the DES questionnaire. Nevertheless, many of S.'s allegations were corroborated by defendant himself in the pretext phone call and in his subsequent conversation with Laurie. Based on this corroboration, the trial court was justified in concluding a reasonable jury could conclude S. accurately perceived and recollected the abuse. "Once that threshold is passed, it is for the jury to decide whether the witness's perceptions and recollections are

16

credible." (*Anderson*, *supra*, 25 Cal.4th at p. 574; see also *People v. Dennis*, *supra*, 17 Cal.4th at pp. 525-526.)

In this regard, *Anderson*, *supra*, 25 Cal.4th 543 is instructive. There, in order to prove the defendant had engaged in violent criminal conduct other than the capital crimes with which he was charged, the People introduced evidence that he had previously murdered Mackey, i.e., Baros's testimony that she witnessed the murder. The defendant presented evidence that Baros believed certain "imaginary" people existed, that an imagined son named Anthony was present during the murder, that she remembered many events through dreams, and that the defendant could communicate with her through telepathy. (*Id*. at p. 570.) Nonetheless, the trial court allowed Baros to testify, explaining that because she gave "a coherent account [of the murder], many details of which were corroborated by independent evidence and would not likely be known by one who was not present," a rational trier of fact could conclude she was present and accurately perceived and recollected what she had seen. (*Id*. at p. 571.)

Our Supreme Court held that "the trial court correctly allowed Baros to testify, and to permit the jury to determine from all the relevant evidence whether her perceptions and memories were true." (*Anderson*, *supra*, 25 Cal.4th at pp. 574-575.) The court explained, "the trial court noted the many indicia by which a rational trier of fact could conclude that Baros, despite her specific delusions, was actually present during the Mackey robbery and murder, and had accurately perceived and recollected those events. Aside from her insistence that her son Anthony was present, Baros presented a plausible account of the circumstances of Mackey's murder. [Citation.] Baros's description included many details, unlikely to be known by a person not present, that were corroborated by independent evidence." (*Id*. at p. 574.) The court also pointed out that extensive evidence was presented to the jury indicating Anthony was a delusion and certain other individuals were also imaginary. The jury also heard Baros's disclosures regarding dreams and telepathy. Accordingly, the jury "had ample basis upon which to

17

judge the reliability of Baros's observations." (*Id*. at p. 575; see also *People v. Lewis* (2001) 26 Cal.4th 334, 357 [while Pridgon's testimony "consisted of inconsistencies, incoherent responses, and possible hallucinations, delusions and confabulations," he " 'presented a plausible account of the circumstances of [the victim's] murder' "].)

Similarly, here, S. provided a plausible account of the sexual abuse defendant inflicted upon her during the time she lived at his house. This account was corroborated by both physical evidence and defendant's own statements made during the pretext phone call. S. testified the sexual abuse began when she was eight years old as defendant spent extra time in her room at bedtime. During the pretext call, defendant initially denied touching her when she was that young. However, when S. said she remembered him putting his hands down her pants at that age, defendant responded: "Yeah, well that was stupid." And when she asked him why he touched her like that, defendant answered: "Because I loved you. I still love you." S. then asked him to confirm that he spent time in her room and touched her because he loved her. Defendant said that was true.

S. also testified that defendant kissed her vagina, brought condoms up to her bedroom, and rubbed his penis against her vagina when she was around 14 or 15 years old. During the pretext call, she told defendant she did not understand why he "would have touched [her] and tried to have sex with [her]" if he did not love her. Defendant agreed and explained in his own words why he did those things: "Because I love you. Because I wanted you, and it was a confused fucking mess that the alternative is a bullet in my head." Later in the call, S. asked whether the "oral sex" was also defendant's way of expressing his love. Defendant answered: "Yeah, I guess." He then admitted what he did was wrong and said: "When you care about somebody like that, I know I fucked up, okay? It'll be different from now on, though. It'll just be you and I." And when S. said, "I was just a kid, Dad," defendant responded: "I know. I'm sorry about that."

S. further testified that, when she was about 15 years old, defendant told her he wanted her to run away with him when she turned 18 and he showed her a stack of $100

18

bills locked in an army box which was set aside for this purpose. During the pretext call, defendant confirmed he wanted to run away with S. when she turned 18. And $39,000 in $100 bills was found in an army box in the garage. S. testified that the abuse ended when she turned 16. This was corroborated by the portion of the pretext call in which she asked whether defendant still wanted her "even like after two years now of like not even doing anything." Defendant answered: "I don't give a fuck about that if we ever do anything again. We don't ever have to do anything again." S. also testified about the incident involving the goat and defendant's discovery that she was dating someone. During the pretext call, defendant asked "what happened with [her] and that other guy" and was concerned she would "dump [him] in a month or a week or something" if they did run away together. We conclude that a rational jury could have found that S. possessed personal knowledge of the abuse.

Nevertheless, defendant asserts, "[a]t the very least, the [trial] court should have held a competency hearing and heard testimony from [S.] and Dr. Scott. The prosecution case depended entirely on the testimony of [S.], and the [trial] court had a duty to resolve the question of her competency. It failed to do so, and [defendant's] convictions rest upon the testimony of a single witness of doubtful competency." The issue of whether the trial court erred by failing to hold a competency hearing is different from the issue of whether the trial court erred by declining defendant's request to order a psychiatric examination. The point is forfeited by defendant's failure to raise it "under a separate heading or subheading summarizing the point," and by the failure to provide any "argument" or "citation of authority" on the issue. (Cal. Rules of Court, rule 8.204(a)(1)(B).) In any event, we disagree. The trial court was able to observe S.'s testimony and never expressed a doubt concerning her competency. While, prior to S.'s testimony, she ran out of the courthouse and a victim's advocate talked to her over the lunch break before she testified, the trial court was made aware of this incident and stated: "It is certainly subject to fair questioning by either [side], but I don't feel there is

19

a need at this point as a preliminary matter. She appears to be oriented, calm, testifying clearly, responsive to the questions. I don't see a need to go into that issue right now." The record supports this assessment.

Finally, defendant points out that "[a] conviction dependent upon the testimony of an incompetent witness renders the trial fundamentally unfair and violates the defendant's due process rights under the state and federal [C]onstitutions. [Citations.] Such a conviction cannot stand." He also reviews the facts of two cases, *People v. Lyons* (1992) 10 Cal.App.4th 837, 844, in which the Court of Appeal held it was error to admit into evidence at trial the preliminary hearing testimony of a witness who was "delusional and unable to distinguish truth from lies at the time of the preliminary hearing," and *Creutz v. Superior Court* (1996) 49 Cal.App.4th 822, 833, in which the Court of Appeal issued a writ of prohibition compelling the trial court to dismiss one count of an information charging the defendant with lewd and lascivious conduct with a child, holding that while the "otherwise incompetent" out-of-court statement of the three-year-old complaining witness would have been admissible under Evidence Code section 1228 for the purpose of establishing the elements of the crime in order to admit as evidence the defendant's confession, there was no confession to admit into evidence. However, while defendant provides the foregoing "citation of authority," he does not provide any "argument" that S. was in fact incompetent to testify and that his due process rights were therefore infringed by the admission of her testimony. (Cal. Rules of Court, rule 8.204(a)(1)(B).) In any event, as we have explained, the trial court properly found that S. possessed the ability to communicate intelligibly and understood the duty of truthful testimony, and that a rational trier of fact could find she accurately perceived and recollected the abuse inflicted by defendant. Accordingly, this contention also fails.

The trial court did not abuse its discretion by declining to order S. to submit to a psychiatric examination before allowing her to testify or by failing to hold a formal

20

hearing to ensure such competency. Nor were defendant's due process rights violated by the trial court's decision to allow S.'s testimony.

## II

*Requested Defense Instruction*

Defendant also claims the trial court prejudicially erred by declining his request to instruct the jury that Dr. Scott was not allowed to conduct a psychiatric examination of S. We disagree.

At the same time defendant requested an order compelling S. to submit to a psychiatric examination, defendant also argued that "[s]hould the Court determine that the examination requested by Dr. Scott . . . is barred by . . . section 1112, [defendant's] right to due process and a fair trial under the Fourteenth Amendment to the United States Constitution mandates an offsetting jury instruction." The requested instruction provided: "You have heard testimony from Charles L. Scott, M.D., an expert witness. Prior to commencement of trial Dr. Scott requested permission from the Court to conduct a psychiatric diagnostic interview of the alleged victim in this matter. Dr. Scott also requested permission to conduct psychological testing if that became appropriate. The requests of Dr. Scott were denied by the Court. California law prohibits the participation of an alleged victim in the requested procedures in cases such as this one."

The trial court declined to give the requested instruction. Explaining it denied defendant's request for a psychiatric examination in order to protect S.'s rights, the trial court clarified that the fact Dr. Scott was not allowed to conduct such an examination could not be used by the prosecution "as a sword against the other side." Thus, the prosecutor would not be allowed "to ask of Doctor Scott or argue in front of the jury, [']well, he didn't even look at her, he didn't meet her,['] when clearly there has been a request, a legitimate good faith request for that to happen." The trial court continued, "if there is a suggestion to the jury that Doctor Scott's opinion should be discounted because

21

he did not personally interview her, then I will consider an instruction along the lines that the defense has tendered here. . . . [¶] . . . No instruction to the jury, unless somehow it is put into play by the prosecution." The prosecutor did not comment on the lack of a personal examination. Accordingly, the requested instruction was not given.

Defendant argues: "The instruction was necessary to ensure that the jury did not discount or devalue Dr. Scott's opinion on a false basis, i.e., that he could have interviewed [S.] but chose not to. It was clear to the jury that there had been no interview; the danger was that they would conclude that the reason Dr. Scott had chosen not to interview her was either because he feared an interview would contradict his [Reactive Attachment Disorder] diagnosis or because he was less than competent. The instruction would have quickly and easily ended any such prejudicial speculation." The notion that the jury speculated as to why Dr. Scott did not personally examine S. is itself speculation. As mentioned, the prosecutor was not allowed to bring up the fact that no such examination took place.

More importantly, a trial court "may properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence [citation]." (*People v. Moon* (2005) 37 Cal.4th 1, 30; see also *People v. Earp* (1999) 20 Cal.4th 826, 886 [a pinpoint instruction is properly rejected as argumentative if it invites the jury to draw an inference favorable to one of the parties from specified items of evidence].) Here, the proposed instruction misstates the law by stating that "California law prohibits the participation of an alleged victim in the requested procedures in cases such as this one." As we have explained, while California law does not allow the trial court to order a psychiatric examination for the purpose of assessing credibility (§ 1112), such an examination is allowed for the purpose of assessing competency to testify if the trial court determines, in its discretion, that the examination is warranted. However, even if the instruction was modified to more accurately state the law, it would still be argumentative.

22

Had the prosecution requested an instruction pointing to the specific fact that Dr. Scott did not personally examine S., thereby inviting the jury to draw the inference that his testimony should be discredited, the instruction would be properly refused as argumentative. So too with respect to the proposed defense instruction pointing to the specific fact that Dr. Scott asked to examine S. but was prevented from doing so.

Even if the proposed instruction should have been given, there is no conceivable prejudice. Assuming for the sake of argument that the jury discounted Dr. Scott's testimony because he did not personally examine S., being informed as to the reason for the lack of a personal examination would not have changed the fact that such an examination did not take place. In other words, while the proposed instruction undoubtedly sought to add credibility to Dr. Scott's testimony by informing the jury he tried to conduct a personal examination, the reason the examination did not occur is irrelevant to the jury's assessment of the believability of his opinion. CALCRIM No. 332 correctly instructed the jury: "In evaluating the believability of an expert witness, . . . consider the expert's knowledge, skill, experience, training, and education, the reasons the expert gave for any opinion, and *the facts or information on which the expert relied in reaching that opinion*." (Italics added.) Nowhere in this instruction is the jury directed to consider either *the reason the expert was given* facts or information relied upon in reaching his or her opinion, or *the reason the expert was prevented from receiving* facts or information that could have been useful in reaching such an opinion. Moreover, as mentioned, S.'s testimony was corroborated by defendant himself in the pretext phone call and in his subsequent conversation with Laurie. Based on this corroboration, we conclude there is no reasonable probability the jury would have disbelieved S.'s testimony had they been informed Dr. Scott requested to conduct a psychiatric evaluation of her, but was prevented from doing so.

The trial court was not required to provide the requested instruction. Nor was defendant prejudiced by the absence of this instruction.

23

# III

## *Defendant's Statement to Police*

Defendant contends the trial court violated his *Miranda* rights by (1) allowing testimony that he was given an opportunity to make a statement to police and had done so, and (2) requiring the jury to be informed, during closing argument, of the content of this statement. We conclude any error was harmless beyond a reasonable doubt.

### A. *Additional Background*

Following the pretext phone call, detectives with the Placer County Sheriff's Department drove to defendant's work site. Detective Michael Davis made contact with defendant, introduced himself, and informed defendant he "had spoken with his daughter [S.]" and "wanted to talk to him." Defendant responded: "Well, let's go then." Detective Davis then placed defendant in handcuffs, informed him he was under arrest, and put him in the back of the police car. While in the car, prior to being given *Miranda* warnings, defendant was asked multiple times whether he wanted to make a statement. Eventually, defendant responded: "[s]hut the fuck up."

Prior to trial, the People moved to admit this statement into evidence. Defendant opposed the motion, arguing the statement was elicited in violation of his *Miranda* rights and should be excluded. Ruling that the second statement, "[s]hut the fuck up," was inadmissible, the trial court explained: "The transcript reflects that the officers asked several times do you want to give a statement, do you want to give a statement. They kept pressing him. All this was before the *Miranda* rights were given."

Detective Davis testified at trial and did not mention the excluded statement. On cross-examination, defense counsel asked: "You didn't take [defendant] to some safe place off the freeway to talk first?" Detective Davis answered: "Well, the immediate lane where we were was closed, so I tried talking to him. I don't know if I can talk about that." Prior to redirect, the prosecutor requested a bench conference and argued this line

24

of questioning implied that Detective Davis "bungled the investigation." Defense counsel again objected to the admission of any statements defendant made "after he was handcuffed because he was not advised of his rights."

After reviewing the transcript, the trial court stated: "The impression from those questions leaves me with the suggestion that when the police arrived, they simply cuffed him up, carted him off to jail without asking him any questions. That is the clear import of what has been asked here, and that would have to be the reasonable conclusion drawn by the jury." Nevertheless, the trial court maintained its position that the "[s]hut the fuck up" statement was inadmissible under *Miranda*. The court elaborated: "I also do feel, [defense counsel], you did open the area. The clear tenor of your cross-examination has been to the effect that the investigation was somewhat superficial, went directly from the pretext call right into action, no investigation or minimal investigation. And certainly the comments that were elicited that I stated verbatim on the record previously indicate to me that it telegraphs to the jury that basically the police swooped in, picked him up and moved him to the jail without giving him an opportunity to explain. That is the clear tenor of it. That to me is inappropriate. [¶] I am not prepared to go to the point where the full statement however comes in. I am going to permit the district attorney to ask: Did you give him an opportunity to give a statement and did he give one. Yes."

In accordance with the trial court's ruling, the prosecutor asked Detective Davis whether he gave defendant an opportunity to make a statement. Detective Davis answered: "Yes." Defense counsel then asked whether defendant in fact made a statement when given the opportunity. Detective Davis answered: "Yes."

During closing argument, defense counsel stated: "And we know from Detective Davis that when they talked, [defendant] made a statement to him. If that statement had been an admission or a confession in any way, shape or form about any of the allegations, you would have heard it. You would have heard it. You didn't because it wasn't." A short time later, during a brief recess, the prosecutor objected to defense counsel's

25

argument that defendant did not provide an admission or confession when he spoke to Detective Davis. The trial court concluded this line of argument violated the "spirit" of its ruling that defendant's statement to Detective Davis was excluded because of the *Miranda* violation and ordered the statement read to the jury when defense counsel resumed his closing argument. Defense counsel expressed disagreement with the trial court's ruling, but agreed to read the transcript to the jury.

The jury was then informed that defendant told Detective Davis to "[s]hut the fuck up" when pressed for a statement.

B. *Analysis*

Defendant first argues the trial court should not have allowed Detective Davis to testify that defendant was given an opportunity to make a statement and had done so, noting he "did not make a 'statement' in the commonly accepted understanding of the word," i.e., "a confession" or "an 'incriminating response.' " Accordingly, argues defendant, "the jury would, understandably, think that [he] had made a statement that incriminated him[self]." We disagree for two reasons. First, defendant's argument ignores the fact it was his trial counsel who initiated this line of testimony concerning whether Detective Davis tried to talk to him. And after the prosecutor was allowed to elicit from Detective Davis that he did give defendant an opportunity to make a statement, defense counsel was the one who followed up by asking whether defendant in fact gave a statement. Thus, defendant elicited the very testimony with which he now takes issue. (See *People v. Steele* (2002) 27 Cal.4th 1230, 1247-1248.) Second, we do not accept defendant's premise that the jury would necessarily have taken the word "statement" to mean "confession" or "incriminating response." In common usage, the word "statement" means "something stated," e.g., "a single declaration or remark" or "a report of facts or opinions." (Merriam-Webster's Collegiate Dict. (11th ed. 2006) p. 1219, col. 1.) Moreover, even if the jury initially believed defendant gave an

incriminating response, the jury was later informed what he really said was, "[s]hut the fuck up." This statement in no way incriminated defendant.

Second, defendant argues the jury should not have been informed of the content of the statement. As the trial court correctly concluded, the "[s]hut the fuck up" statement was elicited in violation of defendant's *Miranda* rights. Defendant was formally arrested, handcuffed, and placed in the back of a police car. He was then asked a series of questions. There can be no question this was a custodial interrogation in which *Miranda* warnings were required and not provided. (See *People v. Pilster* (2006) 138 Cal.App.4th 1395, 1404 [*Miranda* warnings are required where "the suspect is placed under restraints normally associated with a formal arrest," such as being handcuffed, "because the suspect understands the detention is not likely to be 'temporary and brief' and therefore is 'completely at the mercy of the police' "].) Thus, the trial court properly kept defendant's statement out of evidence during the trial. The question remains whether it was error to inform the jury of the content of the statement during closing argument as a remedy for defense counsel's statement that defendant made no admission or confession to police. We need not decide the question because, assuming the trial court's ruling violated defendant's *Miranda* rights, the error was harmless beyond a reasonable doubt.

Federal *Miranda* error "is subject to harmless error analysis in accordance with *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705]." (*People v. Racklin* (2011) 195 Cal.App.4th 872, 877.) We must be convinced the error was "harmless beyond a reasonable doubt." (*Chapman*, at p. 24 [17 L.Ed.2d at p. 711].) In light of S.'s testimony, corroborated in large part by statements defendant made both during the pretext phone call and during his subsequent conversation with Laurie, we conclude that the statement, "[s]hut the fuck up," in no way contributed to the verdict. Rather than an incriminating statement, the jury heard four words that had no bearing on the facts, the evidence, or the guilt or innocence of the defendant. Defendant argues that because the

27

jury was instructed with CALCRIM No. 357,[2] informing the jury on the use of adoptive admissions, "[a] juror could readily conclude that [defendant] would have denied what [S.] had told the police if it were not true and that his failure to do so was an adopted admission under the court's instruction." We disagree. Detective Davis made no statement for defendant to admit or deny. He simply stated he had spoken with S. and asked whether defendant wanted to make a statement. Defendant responded: "Shut the fuck up." No reasonable juror would have taken this statement to be an adoptive admission. Accordingly, any error was harmless beyond a reasonable doubt.

IV

*Retention of the Pretext Phone Call Transcript*

Defendant further asserts the trial court prejudicially erred by allowing the jurors to retain, during the remainder of the trial, their copies of the transcript of the pretext phone call between S. and defendant. We need not determine whether the trial court erred in this regard because we conclude there was no prejudice.

We first note that the transcript of the pretext phone call was admitted into evidence without objection. Thus, defendant has forfeited any argument that the jury could not consider this transcript during their deliberations. (*People v. Houston* (2012) 54 Cal.4th 1186, 1213.) Defendant did object to the fact that the jury was allowed to

_____

[2] CALCRIM No. 357, as given to the jury in this case, provides: "If you conclude that someone made a statement outside of the court that accused the defendant of the crime or tended to connect the defendant with the commission of the crime, and the defendant did not deny it, you must decide whether each of the following is true: First, the statement was made to the defendant or made in his presence. Second, the defendant heard and understood the statement. Third, the defendant would under all circumstances naturally have denied the statement if he thought it was not true. And, fourth, the defendant could have denied it but did not. [¶] If you decide that all of these requirements have been met, you may conclude that the defendant admitted the statement was true. [¶] If you decide that any of these requirements has not been met, you must not consider either the statement or the defendant's response for any purpose."

28

retain their copies of the transcript between the time the phone call was played and the time they began their deliberations. He argues this procedure " 'unduly emphasize[d]' " the content of the phone call, citing *People v. Stevenson* (1978) 79 Cal.App.3d 976, a case in which the Court of Appeal found it to have been error for the trial court to provide the jury with transcripts of the preliminary hearing testimony of two dead prosecution witnesses while this testimony was read into evidence. (*Id*. at p. 990.) The court explained: "An analogy can be drawn to the reason for the procedural rule as to past recollection recorded evidence in Evidence Code section 1237, subdivision (b): 'The writing may be read into evidence, but the writing itself may not be received in evidence unless offered by an adverse party.' . . . [T]he reason for the rule 'is to prevent giving past recollection recorded evidence greater stature than the oral testimony of a witness.' " (*Stevenson,* at p. 990.) However, because the court reversed the defendant's convictions for other reasons (i.e., the prejudicial failure to instruct the jury on every material question presented by the evidence), it did not decide whether the additional error of providing the jury with the transcripts of the preliminary hearing testimony was prejudicial.

Here, even assuming the trial court erred by allowing the jury to retain their copies of the pretext phone call transcript throughout the trial, the error was harmless. There is no assertion that the purported error violated any of defendant's federal constitutional rights. Accordingly, the standard for reversal is that articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836. Under this standard, "[r]eversal is required if it is reasonably probable a result more favorable to [defendant] would have been reached" had the jury not been allowed to retain the transcripts between the time the phone call was played and the time they began their deliberations. (*People v. Moten* (1991) 229 Cal.App.3d 1318, 1327.) For the reasons previously stated, there was no such probability.

V

*Cumulative Prejudice*

We have found no error.  Nor have we found prejudice where error has been assumed.  Indeed, assuming there was a *Miranda* violation, we conclude the error was harmless beyond a reasonable doubt.  Nor would we find "any cumulative deficiency arose from a combination of particular errors requiring reversal." (*People v. Salcido* (2008) 44 Cal.4th 93, 156.)  Accordingly, defendant's assertion of cumulative prejudice fails.

DISPOSITION

The judgment is affirmed.

                                                                    HULL                            , J.


We concur:



        NICHOLSON        , Acting P. J.



        MAURO           , J.